## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | **Case No. 20-cr-00038-DKC-1** |
| **v.** | * | |
| | * | |
| | * | |
| **JEROAM EDWIN NELSON, JR.** | * | |
| | * | |
| | * | |
| **Defendant** | * | |
| | *********** | |

## <u>MEMORANDUM OPINION AND ORDER OF COURT</u>

This matter is before the Court on the defendant's Emergency Motion to Reopen Detention Hearing and to Order Pretrial Release  (the "Motion") (ECF No. 81), the government's Response in Opposition to Defendant's Motion to Reopen Detention Hearing (the "Opposition") (ECF No. 83), the defendant's Reply in Support of Emergency Motion to Reopen Detention Hearing and to Order Pretrial Release (the "Reply") (ECF. No. 84), the defendant's Supplement to the Emergency Motion to Reopen the Detention Hearing and Order Pretrial Release (the "Supplement") (ECF No. 88), and the government's Supplemental Response in Opposition to Defendant's Motion to Reopen Detention Hearing (ECF No. 92).  The issues have been fully briefed, and no hearing is necessary.  L.R. 105.6, 207.  For the reasons stated below, the Motion is **DENIED**.

## I.  PROCEDURAL HISTORY

On January 29, 2020, a federal grand jury returned an indictment charging the defendant with Possession with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 841(a)(1), and Possession of Ammunition by a Prohibited Person, in violation of 18 U.S.C.

§ 922(g)(1).  The defendant appeared for his initial appearance on January 29, 2020.  On January 31, 2020, the defendant appeared before this Court for a detention hearing.[1]

## II.  DETENTION HEARING

At the detention hearing the government argued that the defendant should be detained based on danger to the community.  The government pointed out that a presumption of detention applied in this case under 18 U.S.C. § 3142(e)(3)(A).  It proffered the following facts in support of its argument.  The case against the defendant was the result of a lengthy wiretap investigation by the DEA and the Washington County Narcotics Task Force into a heroin and fentanyl drug trafficking organization in the Washington County, Maryland, area.  The defendant was identified as a large-scale, international supplier of fentanyl and heroin in that part of Maryland.  The investigation involved controlled buys of drugs, wire taps on three cell phones used by the defendant, and a tracking warrant on the defendant's car.  The investigation culminated in the execution of a search warrant at the defendant's residence on September 9, 2019.  The defendant was found at his residence with approximately 38 grams of a heroin/fentanyl mixture on his person.  In the residence the agents found and seized a brick-shaped package containing one kilogram of a heroin/fentanyl mixture, a bag containing 231 grams of fentanyl, another bag containing 2.5 grams of heroin, digital scales, an aluminum press used for packaging drugs, and a heat sealer bag.  The agents also found $2,180 in cash in the defendant's car.[2]

---

[1] The operative charging document at the present time is the second superseding indictment returned by the grand jury on March 4, 2020, charging the defendant with Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 846; Possession with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 841(a)(1); and Possession of Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1).

[2] The government proffers additional incriminating facts in its Opposition.  *See* Opposition (ECF No. 83 at 10-15).

In response, the defendant argued that he should be released on conditions of release, including 24-hour home detention with location monitoring at the residence of a third-party custodian. He asked the Court to consider the following points. The allegations against him do not involve violence or intimidation. He was not charged with a firearm offense, no firearms were found in his residence or car, and he has never been convicted of a firearms offense. He was a lifelong resident of the Hagerstown area. He has a strong family support system. The Court noted that the defendant's mother and girlfriend were present in the courtroom. The defendant cares for his disabled mother. He is a dedicated father to his two children. He has a work history, obtained a GED, but has struggled with substance-abuse issues. The defendant argued that these facts rebutted the presumption of detention and in favor of release.

After hearing from the parties, the Court reviewed the factors set forth in 18 U.S.C. § 3142(g). The first factor required the Court to review the nature and circumstances of the offenses charged. The Court observed that the defendant was charged with offenses involving a controlled substance and ammunition. *See* 18 U.S.C. § 3142(g)(1). The second factor required the Court to consider the weight of the evidence against the defendant. The Court found that the weight of the evidence against the defendant was strong based on the information proffered by the government. *See id.* § 3142(g)(2). The third factor required the Court to consider the history and characteristics of the defendant. Here, the Court noted the defendant's strong ties to the Hagerstown community and his strong family support. The Court also observed that the defendant has struggled with substance-abuse issues in the past. The Court then reviewed the defendant's criminal history, which includes convictions for the following offenses: Possession of Cocaine, Possession with Intent to Distribute Marijuana, Second Degree Assault, and Distribution of Heroin. He has been found in violation of probation four times, and there have

been three unsatisfactory closings of parole supervision.  At the time of the present allegations, the defendant was on unsupervised probation in the possession with intent to distribute marijuana case and on supervised probation in the distribution of heroin case.  *See id.* § 3142(g)(3).  The fourth and final factor required the Court to assess the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. The Court found that the defendant would pose a serious danger to the community if released.  In making this finding the Court considered that the search of the defendant's residence and car yielded distribution quantities of heroin and fentanyl, and equipment used to package controlled substances for distribution.  Ammunition was also found in the defendant's residence.  More than $2,000 in cash was found in the defendant's car.  The Court also considered the defendant's criminal history.  He has been convicted of felony controlled-substance offenses twice before and was on probation for those offenses at the time of the present offenses.  He has been found in violation of probation in the past, and his parole supervision has been closed in an unsatisfactory status several times. *See id.* § 3142(g)(4).

Given its finding that the defendant posed a serious danger to the community if released, the Court then considered whether there were conditions of release that could be fashioned to mitigate that danger and assure the safety of the community.  Specifically, the Court considered the defendant's proposed release plan – 24-hour home detention with location monitoring in the residence of a third-party custodian.  Ultimately, the Court found that the defendant failed to rebut the presumption of detention.  Further, the Court found by clear and convincing evidence that there was no condition or combination of conditions that would reasonably assure community safety.  The defendant's proposed release plan was not adequate in the Court's opinion to reasonably assure the safety of the community.  Therefore, the Court ordered that the

defendant be detained.  *See* Order of Detention (ECF No. 14).  At the present time the defendant

is detained in the D.C. Department of Corrections (the "DOC") at the Central Treatment Facility

("CTF").[3]

III. THE § 3142(g) FACTORS

> Under 18 U.S.C. § 3142(f), a detention hearing

> may be reopened, before or after a determination by the judicial officer, at any
> time before trial if the judicial officer finds that information exists that was not
> known to the movant at the time of the hearing and that has a material bearing on
> the issue whether there are conditions of release that will reasonably assure the
> appearance of such person as required and the safety of any other person and the
> community.

The defendant argues that the detention hearing should be reopened because information exists

that was not known to him at the time of the detention hearing, and that this information has a

material bearing on the issue of whether there are conditions of release that will reasonably

assure his appearance as required and the safety of any other person and the community.  He then

argues that, considering the new information, conditions of release can be fashioned to assure his

appearance as required and the safety of any other person and the community.

Specifically, the defendant contends that his history of high blood pressure makes him

especially vulnerable to contracting COVID-19 as a detainee at CTF and heightens his risk of

severe illness if infected with COVID-19.  *See* Motion (ECF No. 81 at 10 & n.27 (citing, *inter*

*alia*, *What Heart Patients Need to Know About COVID-19*, Health Essentials from Cleveland

Clinic (Mar. 27, 2020), https://health.clevelandclinic.org/what-heart-patients-need-to-know-

about-covid-19/), 12).  In support of his claim, the defendant has attached 17 pages of medical

records to the Motion.  *See* Motion, Ex. A (ECF No. 81-1).  Those records reflect that, between

---

[3] Many pretrial detainees from the District of Maryland are detained in CTF and the D.C. Jail,
both part of the DOC.

March 22, 2020 and March 28, 2020, the defendant was seen by medical staff on several occasions for various complaints including chills, body aches, headache, and chest pain. He reported a history of elevated blood pressure. During that time period, his temperature and blood pressure were checked periodically. His temperature ranged from a low of 96.0 degrees to a high of 99.7 degrees.[4] His blood pressure ranged from a low of 131/84 mm Hg to a high of 163/89 mm Hg.[5] He generally denied having shortness of breath or a cough. He was tested for the flu with negative results. Significantly, the medical staff found that he did not exhibit symptoms consistent with the coronavirus, noting no cough, shortness of breath, or abnormal chest sounds. He was prescribed ibuprofen and advised to increase his fluid intake. Eventually, he was placed in quarantine for possible exposure to COVID-19, although he was asymptomatic for COVID-19. The records do not reflect that he was ever tested for COVID-19.

Contrary to the determination of the medical staff, the defendant maintains he did exhibit symptoms consistent with COVID-19 and should have been tested and treated in accordance with the guidelines formulated by the Centers for Disease Control and Prevention (the "CDC"). Specifically, he notes that he was not given a mask or placed in medical isolation. *See* Motion (ECF No. 81 at 9-10). The defendant makes references throughout the Motion that CTF is not adhering to CDC guidance to protect its residents from the risk of exposure to COVID-19 and to curtail the spread of the virus.

COVID-19 is a worldwide pandemic that has had a profound impact on the health and daily life of millions of people. In the recent case of *Coreas v. Bounds*, Civil Action No. TDC-

---

[4] One reading of 101.7 degrees was considered unusual and likely spurious.

[5] According to the American Heart Association, a normal blood pressure reading is less than 120/80 mm Hg. *Understanding Blood Pressure Readings*, Am. Heart Ass'n, https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings (last updated Nov. 30, 2017).

20-0780, 2020 WL 1663133 (D. Md. Apr. 3, 2020), United States District Judge Theodore D.

Chuang summarized the nature of the virus, the risks of exposure to it, and the steps employed

by local governments and communities to curtail its spread:

> The virus identified as SARS-CoV-2, commonly referred to as the novel coronavirus ("the Coronavirus"), has caused a global pandemic of the condition known as COVID-19. As of April 3, 2020, there were 932,166 confirmed cases and 46,764 deaths worldwide. *Coronavirus Disease (COVID-19) Pandemic*, World Health Org., https://www.who.int/emergencies/diseases/novel-coronavirus-2019. As of April 2, 2020, there were 213,144 confirmed cases and 4,513 deaths in the United States. *Cases in U.S.*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html. The Centers for Disease Control and Prevention ("CDC") has projected that, without effective public health intervention, about 200 million people in the United States may contract the disease, and, under some projections, as many as 1.5 million people in the United States may die from the disease. Another organization's projection puts the potential number of American fatalities at 2.2 million. Moreover, some evidence suggests that, even when not fatal, COVID-19 results in long-term, serious illnesses, which may include severe damage to internal organs, in about 16 percent of cases.

> COVID-19 poses special risks for the elderly and those with certain preexisting medical conditions. *Amici Curiae* Public Health and Human Rights Experts Br. at 6-7, ECF No. 32. The CDC has identified several medical conditions that place an individual at an increased risk of serious COVID-19 complications: "blood disorders, chronic kidney or liver disease, compromised immune system, endocrine disorders, including diabetes, metabolic disorders, heart and lung disease, neurological[,] neurologic and neurodevelopmental conditions, and current or recent pregnancy." Greifinger Decl. ¶ 7, Reply Mot. TRO ("Reply") Ex. 6, ECF No. 52-6. Of those who have died from COVID-19 in Italy, another country experiencing a high number of COVID-19 cases, about three-fourths had high blood pressure, one-third had diabetes, and one-third had heart disease. According to Dr. Jonathan Louis Golob, an Assistant Professor at the University of Michigan School of Medicine, there is evidence that in the highest risk populations, COVID-19 causes death in about 15 percent of cases. Preliminary data from China has shown that 20 percent of COVID-19 cases involving high-risk categories have resulted in death.

> There is no vaccine, antiviral treatment, or cure for COVID-19. The Coronavirus is believed to spread through "droplets" that can be transmitted during close interpersonal contact, though these droplets can also survive on surfaces for days and spread the disease even absent such close contact. *Id.* ¶ 21. There is some evidence that individuals with the Coronavirus can transmit it to others even when they are not yet symptomatic. Public health measures aiming to

stop the spread of the virus—most notably the practice of social distancing—have been widespread: "[s]chools, courts, collegiate and professional sports, theater and other congregate settings have been closed," *id.* ¶ 8, and many states have issued mandatory social distancing polices.  The Governor of Maryland issued a stay-at-home order on March 30, 2020.  *See* Order of the Governor of the State of Maryland    §    II,    No.    20-03-30-01    (Mar.    30,    2020), https://governor.maryland.gov/wp-content/uploads/2020/03/Gatherings-FOURTH-AMENDED-3.30.20.pdf.    As of April 2, 2020, 40 states and the District of Columbia had issued stay-at-home or shelter-in-place orders.  *See These States Have Implemented Stay-at-Home Orders*, CNN (Apr. 2, 2020), https://www.cnn.com/2020/03/23/us/coronavirus-which-states-stay-at-home-order-trnd/index.html.

*Coreas*, 2020 WL 1663133, at *1-2.

Judge Chuang also reviewed the vulnerabilities of persons detained in jails and detention facilities caused by COVID-19:

> Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19.  First, even if these facilities suspend in-person visitation, the staff, contractors, and vendors working at the facilities can still introduce the Coronavirus into the facility, a risk that is all the more difficult to contain because asymptomatic individuals can transmit the virus and because these facilities lack the capacity to screen for the virus in asymptomatic individuals.  According to Petitioners' expert, Dr. Robert B. Greifinger, an expert on prison and jail health care and the former manager of medical care for the New York State prison system, "[j]ails and detention centers are congregate environments where the risk of infection and infectious spread are extraordinarily high."  Greifinger Decl. ¶¶ 1-2, 16.  Indeed, there have already been confirmed outbreaks of COVID-19 at several prisons and detention facilities across the United States, including the Rikers Island detention facility in New York City, the Cook County Jail in Chicago, Illinois, and the federal prison in Oakdale, Louisiana, as well as certain New Jersey jails housing ICE detainees.  In this region, COVID-19 has been identified in the Clifton T. Perkins Hospital Center, a psychiatric hospital in Jessup, Maryland; and the D.C. Jail in Washington, D.C.

> Second, once the Coronavirus is introduced into a detention facility, the nature of these facilities makes the mitigation measures introduced elsewhere in the country difficult or impossible to implement.  Detention facilities often lack personal protective equipment that helps prevent the transmission of the virus.  Shared facilities, such as bathrooms, dining halls, and telephones, are often not disinfected between uses.  Poor ventilation increases the risk of transmission.  Detained individuals are often not given the opportunity or tools to wash or sanitize their hands frequently.  And the crowded nature of the facilities can make social distancing recommended by the CDC impossible.

*Id.* at *2.

At the outset, the Court finds that the unprecedented magnitude of the COVID-19 pandemic and the heightened risk of exposure to residents of detention facilities constitute information not known to the defendant at the time of the detention hearing that has a material bearing on whether conditions of release can be fashioned to assure the appearance of the defendant as required and the safety of the community.  *See, e.g.*, *United States v. Bilbrough*, Criminal Case No. TDC-20-0033, Order at 4 (D. Md. Mar. 20, 2020), *aff'd*, 2020 WL 1694362 (D. Md. Apr. 7, 2020); *United States v. Martin*, Criminal Case No. PWG-19-140-13, 2020 WL 1274857, at *2 (D. Md. Mar. 17, 2020).  This is particularly true given the defendant's history of high blood pressure and early findings that high blood pressure could raise the risk of experiencing severe complications from the coronavirus regardless of age.  *See Keeping a lid on blood pressure during the coronavirus crisis*, Am. Heart Ass'n, https://www.heart.org/en/coronavirus/coronavirus-covid-19-resources/keeping-a-lid-on-blood-pressure-during-the-coronavirus-crisis (last updated Apr. 7, 2020).  Therefore, the defendant has established a satisfactory basis to reopen the detention hearing.  The Court now reviews the factors set forth in 18 U.S.C. § 3142(g) to determine if there are now conditions of release that could be fashioned to assure the defendant's appearance as required and the safety of the community.

The defendant does not challenge the Court's original findings with respect to the first two factors – the nature and circumstances of the offenses charged, and the weight of the evidence against him.  Therefore, the Court reaffirms its original findings regarding those factors.  Concerning the third factor, the defendant underscores the new information noted above regarding his physical condition, heightened risk of exposure to COVID-19 and complications if

he does contract the virus, and the failure of the authorities at CTF to protect adequately detainees from the virus.  In response, the government points out that, although the defendant claims a documented history of high blood pressure, he does not assert that he has been diagnosed with hypertension or that he suffers from cardiovascular disease, conditions which health authorities have stated may be comorbidities with COVID-19.  *See* Opposition (ECF No. 83 at 8, citing Motion (ECF No. 81 at 3 n.7)).  The government also highlights the comprehensive precautionary measures instituted by the DOC to limit the transmission of COVID-19.  *See* Opposition (ECF No. 83 at 20-24).  Finally, the government asserts that the defendant was appropriately treated for the symptoms he exhibited.  *See* Opposition (ECF No. 83 at 26).

Regarding the fourth factor, the defendant again contends that he would not pose a danger to the community if released.  He reiterates that the allegations against him do not involve violence or intimidation, that he is not charged with an offense involving the use of a firearm, that no firearms were found in his residence or car, that he is not a violent person, and that he has never been convicted of a weapons offense.  *See* Motion (ECF No. 81 at 3-4, 12).  He now also asserts that he would not pose a danger if released because his health would require him to stay inside where he would be safest.  *See* Motion (ECF No. 81 at 11-12).

The Court has again reviewed the factors contained in 18 U.S.C § 3142(g), including the new information regarding the defendant's physical condition and how it bears upon the determination of the nature and seriousness of the danger to the community he would pose if released.  Upon that review, the Court reaffirms its prior finding that the defendant would pose a serious danger to the community if released.  The government avers that the defendant is a high-level, international supplier of fentanyl and heroin in the Hagerstown, Maryland, area.  The

physical evidence obtained as a result of the search of the defendant's residence and car, along with the evidence obtained as a result of the wiretaps on the defendant's phones, support that characterization.   The number of fentanyl-related deaths is growing at an alarming rate. According to the Maryland Department of Health, during the time period from 2007 to 2018, the number of fentanyl-related deaths in Maryland grew from 26 in 2007 to 1,888 in 2018.  The last few years have seen significant increases each year – 340 (2015), 1,119 (2016), 1,594 (2017), and 1,888 (2018).  The 1,888 fentanyl-related deaths in 2018 were more than twice the number of heroin-related deaths (830) and five times more than deaths attributed to prescription opioids (379).  Washington County has also experienced significant increases in fentanyl-related deaths in the recent past – 14 (2015), 31 (2016), 39 (2017), and 70 (2018).[6]  Of course, the defendant is presumed innocent of the charges against him, and the Bail Reform Act does nothing to modify or limit the presumption of innocence.  18 U.S.C. § 3142(j).  The weight of the evidence against him is overwhelming, however.

The Court's finding that the defendant would pose a serious danger to the community if released is based not only on the strength of the government's case, but also on his criminal history.  The defendant has previously been convicted of Possession of Cocaine, Possession with Intent to Distribute Marijuana, and Distribution of Heroin, and he served significant terms of incarceration for those offenses.  He has been found in violation of probation four times and served significant terms of incarceration for those violations.  Most significantly, the facts underlying the charged offenses occurred while he was on unsupervised probation in the

---

[6] *Unintentional Drug- and Alcohol-Related Intoxication Deaths in Maryland, 2018*, Md. Dep't of Health, Behavioral Health Admin. 16, 57 (May 2019), https://bha.health.maryland.gov/Documents/Annual_2018_Drug_Intox_Report.pdf.

possession with intent to distribute marijuana case and on supervised probation in the distribution of heroin case at the time of the present offenses.

The defendant's argument that he would not pose a danger to the community if released because his health concerns would require him to remain inside the residence is unavailing. High blood pressure can be managed with medication or by making lifestyle changes.[7]  The defendant does not suggest that his activities of daily living are significantly curtailed because of this condition.  He merely argues that, because his high blood pressure enhances his risk of contracting the COVID-19 and experiencing severe complications if he becomes infected, he has an incentive to remain in his residence to reduce his potential for exposure to the virus.  This is not a case where because of advanced age, physical disability, or serious incapacitating illness, the Court would have some confidence that the defendant would remain in his residence if so ordered.  A person suffering from high blood pressure can be just as dangerous as a person who does not.[8]  In short, the new information regarding the defendant's physical condition has been considered, but it does not change the Court's previous finding that the defendant would pose a danger to the community if released.

Given this finding, the Court must now determine whether there is a condition or combination of conditions of release that will mitigate that danger and assure community safety. The defendant again proposes that he be released to the custody of a third-party custodian on home detention with electronic monitoring, being authorized to leave the residence only for court appearances, medical appointments, and emergencies.  If the Court were to release the defendant

---

[7] *Changes You Can Make to Manage High Blood Pressure*, Am. Heart Ass'n, https://www.heart.org/en/health-topics/high-blood-pressure/changes-you-can-make-to-manage-high-blood-pressure (last updated Nov. 30, 2017).

[8] *See Martin*, 2020 WL 1274857, at *4 (defendant ordered detained for the protection of the community despite suffering from high blood pressure, asthma, and diabetes).

on conditions of release, at a minimum those conditions of release would include the following: 1) the defendant would be placed in the custody of a suitable third-party custodian and would reside at the residence of that third-party custodian; 2) the defendant would be placed on 24-hour home detention with location monitoring; 3) the defendant would be prohibited from accessing the internet; 4) the defendant would be prohibited from using and possessing computer systems, internet-capable devices and/or similar electronic devices, including cell phones and iPads; and 5) the defendant would avoid all contact with potential witnesses, co-defendants, co-conspirators, and other associates in his alleged drug distribution enterprise.

The defendant proposes two potential third-party custodians, his brother, Brandon Greene, or his aunt, Robin Parker. Mr. Greene resides in Chambersburg, Pennsylvania, and is employed as a local truck driver. Although he works full time, he resides only three miles from his work and would be available much of the day to supervise the defendant. Mr. Greene was convicted in 2006 of distribution of cocaine. He served a four-year sentence for that conviction. In 2004, he was convicted of possession of marijuana and received probation before judgement in 2003 for possession of CDS paraphernalia. Given the nature of the charges against the defendant and the nature of Mr. Greene's criminal history, the Court does not find that Mr. Greene is a suitable third-party custodian.

The defendant's aunt, Robin Parker, resides in Hagerstown, Maryland, with her husband, Elvert Parker, and their daughter, Nyshea Parker. Ms. Parker would be present to supervise the defendant, as she does not work because of health issues. According to the Pretrial Services report, Mr. Parker is presently on State supervision until 2028 for a 2004 conviction for Assault-First Degree. The Pretrial Services report also reflects that Mr. Parker has been convicted of the following offenses: Arson-First Degree (1988); Distribution of Controlled Dangerous Substances

(1986); Possession of Controlled Dangerous Substances (1990); Violating a Protective Order (2003); Assault – First Degree (2003); and Controlled Dangerous Substance: Possession-Not Marijuana (2004).  He also received probation before judgement for Assault-Second Degree in 1997.  Although Ms. Parker may be a suitable third party custodian, it would not be appropriate for the defendant to reside with his uncle, given the nature of the charges against the defendant, the nature of Mr. Parker's criminal history and the fact that Mr. Parker is presently on supervision  for first degree assault.

The defendant also proposes that he be required to reside with the third-party custodian on 24-hour home detention with location monitoring.  Traditional home detention with location monitoring requires a probation officer to install a transmitter to the defendant's ankle.  That practice, however, does not permit the probation officer to maintain an appropriate social distance, thereby potentially placing the probation officer and the defendant at a higher risk of transmitting the COVID-19 virus.  As such, the United States Probation Office has suspended this traditional location monitoring and instead now employs other location monitoring techniques, including SmartLink, VoiceID, and Home Incarceration by Phone.  These alternative technologies would not be adequate in this case for several reasons.  First, they would not monitor the defendant's location in real time.  Rather, they would determine the defendant's location on a periodic basis throughout the day.  With traditional home detention with location monitoring, the monitoring agency would receive an alert the moment a defendant leaves the residence or tampers with the transmitter.  The alternative technologies now in use do not offer that high level of protection. The defendant could come and go without the knowledge of his probation officer, depending on the timing and frequency of the location checks.

The Court would also require that the defendant be prohibited from accessing the internet and from using and possessing computer systems, internet-capable devices and/or similar electronic devices, including cell phones and iPads. These conditions are critical to assure the safety of the community. As the government points out, much of the defendant's criminal activity did not require him to leave his residence. According to the government, the defendant facilitated the importation of kilogram quantities of fentanyl and heroin from Mexico to the United States by phone. He arranged for the distribution of controlled substances with lower-level distributors by phone. He engaged in transactions involving drug proceeds electronically. Therefore, it is critical that the Court is assured not only that the defendant is restricted to the residence but also that his ability to meet in person or communicate by phone or over the internet and his ability to engage in financial transactions electronically are eliminated. Other than location monitoring, these additional restrictions would have to be monitored and enforced by the third-party custodian. Even if a suitable third-party custodian made a good-faith effort to enforce these restrictions, it would not be difficult for the defendant to circumvent them. For example, the defendant could obtain a laptop computer, cell phone, iPad, or other electronic device without the knowledge of the third-party custodian. He could surreptitiously use that device in the residence without the knowledge of the third-party custodian to communicate with associates and/or engage in drug distribution or financial transactions. He could do so with or without internet access.

In making the crucial decision of whether to release a defendant on conditions of release and, if so, what those conditions should be, the Court must have a high level of confidence that the defendant will comply with those conditions. If the Court does not have that level of confidence, releasing the defendant on conditions would not only be imprudent, but futile. In

this case, the Court does not have that high level of confidence because of the defendant's history of violating conditions of probation, knowing that violating probation could result in a period of incarceration.  In fact, he has been found in violation of probation on four occasions. His parole supervision has been closed in an unsatisfactory status three times. Significantly, the offenses charged in this case occurred while the defendant was on unsupervised and supervised probation in two felony controlled-substance cases.   Time and time again the defendant has demonstrated that he cannot or will not abide by court orders.  The defendant's assertion that he has an incentive to remain in the home, to shelter himself from the public and reduce his risk of exposure to COVID-19, provides the Court little assurance that he will actually do so.

In summary, the defendant has established grounds to reopen the detention hearing.  He suffers from high blood pressure.  Although that is not new information, the fact that his high blood pressure may put him at a higher risk of contracting COVID-19 or suffering severe complications if he does contract it while incarcerated, is new information having a material bearing on the issue of whether there are conditions of release that will assure the safety of the community.   Nonetheless, after reviewing the factors contained in 18 U.S.C. § 3142(g), including the new information, the Court again finds that the defendant has failed to rebut sufficiently the presumption of detention, and it again finds by clear and convincing evidence that there is no condition or combination of conditions of release that will reasonably assure the safety of the community.

## IV.  SIXTH AMENDMENT RIGHT TO EFFECTIVE REPRESENTATION

As an alternative ground for release, the defendant argues that his continued detention at CTF violates his Sixth Amendment right to effective representation.  *See* Motion (ECF. No. 81 at 14-15).  Here, the defendant asserts that, because of the restrictions imposed at CTF due to

COVID-19, the defendant effectively has been precluded from communicating with counsel. The government, on the other hand, points out the measures in place at CTF to allow detainees access to counsel, although restricted.  *See* Opposition (ECF No. 83 at 29-31).  The Court first notes that access to counsel is not a factor to be considered under 18 U.S.C. § 3142(g).  The Court recognizes, however, that the policies and procedures that CTF has implemented to enhance the safety of detainees and staff present challenges to communications with counsel. The Court has canceled all non-emergency proceedings through June 5, 2020, however.  *See In re: Court Operations Under the Exigent Circumstances Created by COVID-19*, Case No. 1:00-mc-00308, Standing Order 2020-07 (D. Md. Apr. 10, 2020).  Therefore, the present restrictions on communications with counsel will not delay his case.  Once the Court is fully operational, the defendant and his counsel will have adequate time to consult and prepare his defense.  *See United States v. West*, No. ELH-19-364, 2020 WL 1820095, at *6 (D. Md. Apr. 10, 2020); *Bilbrough*, 2020 WL 1694362, at *4.  On April 19, 2020, the United States District Court for the District of Columbia ordered that detention facilities operated by the DOC, including CTF, "ensure that all inmates, including those on isolation, have access to confidential, unmonitored legal calls of a duration sufficient to discuss legal matters."  *Banks v. Booth*, Civil No. 20-849(CKK), 2020 WL 1914896, at *15 (D.D.C. Apr. 19, 2020).  Therefore, counsel should soon be able to communicate more effectively with the defendant.  Finally, assuming *arguendo* that the current restrictions on contacts and communications with counsel constitute a violation of the defendant's Sixth Amendment rights, he fails to cite any authority that his release is an appropriate remedy.  For these reasons the Court does not find that release is warranted based on any infringement of the defendant's Sixth Amendment rights.

## V. TEMPORARY RELEASE UNDER § 3142(i)

The defendant's final argument for release invokes the provisions of 18 U.S.C. § 3142(i). Under 18 U.S.C. § 3142(i), the Court "may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal, or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."   As stated above, release is not necessary for preparation of the defendant's defense.   In a recent remand to this Court, the Fourth Circuit directed this Court to

> consider in the first instance the severity of the risk that the COVID-19 virus poses to the defendant, given his existing medical conditions and the current COVID-19 situation at the facility where he is being held, and whether that risk, balanced against the other Bail Reform Act factors, rises to the level of a "compelling reason" for temporary release under 18 U.S.C. § 3142(i).

*United States v. Creek*, No. 20-4251, Order at 1 (4th Cir. Apr. 15, 2020).

In the context of COVID-19, four factors are to be considered in determining whether a compelling reason permitting temporary release under 18 U.S.C. § 3142(i) has been established: (1) the original grounds for detention; (2) the specificity of a defendant's COVID-19 concerns; (3) the extent to which the proposed release plan is designed to mitigate or exacerbate other COVID-19 risks to the defendant; and (4) the likelihood that a defendant's release would increase the COVID-19 risks to others.   *United States v. Green*, No. CCB-19-0539, 2020 WL 1873967, at *3 (D. Md. Apr. 15, 2020) (citing *United States v. Clark*, __ F. Supp. 3d __, No. 19-40068-01-HLT, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020)).   The defendant has the burden to show that circumstances warranting temporary release under § 3142(i) exist.   *United States v. Sanders*, No. 19-20037-01-DDC, 2020 WL 1528621, at *3 (D. Kan. Mar. 31, 2020). "The question for the Court is whether the COVID-19 health risks to the Defendant, should he

remain detained, outweigh those traditional Section 3142(g) factors *and* the COVID-19 health risk to the community that Defendant's release could occasion." *United States v. Hernandez*, No. PX-19-158-9, slip op. at 5-6 (D. Md. Apr. 29, 2020).

As discussed previously, the original grounds for detention weigh heavily in favor of the government and need not be repeated here.  Regarding the defendant's COVID-19 concerns, the defendant's history of high blood pressure makes him especially vulnerable to contracting COVID-19 and heightens his risk of severe illness if infected with COVID-19.  The medical records show that, from March 22, 2020, through March 28, 2020, he was seen by medical staff on several occasions for various complaints, including chills, body aches, headache, and chest pain.  He was tested for the flu with negative results.  He was prescribed ibuprofen and advised to increase his fluid intake.  The medical staff found that he did not exhibit symptoms consistent with the coronavirus and was not tested for COVID-19.  At one point he was placed in quarantine for possible exposure to a confirmed COVID-19 case.  Contrary to the determination of the medical staff, the defendant maintains he did exhibit symptoms consistent with COVID-19 and should have been tested and treated in accordance with the guidelines formulated by the CDC.  Specifically, he complains that he was not given a mask or placed in medical isolation. The final treatment note in the medical records is dated March 28, 2020.  It notes that he was feeling well that day and denied a cough, fever/chills, and shortness of breath.  Specifically, it noted: "Asymptomatic patient on quarantine for possible exposure to COVID-19 – doing well with no new symptom."  The medical records establish that the defendant was treated for his symptoms with positive results.  Therefore, the defendant's health issues are not so grave as to warrant immediate release.

19

As to the current COVID-19 situation at CTF, it is indisputable that the virus has infiltrated the facility. As of April 28, 2020, the District of Columbia reported that, within the DOC, 131 detainees have tested positive for COVID-19 (45 detainees are in isolation for a positive test, and 85 detainees have recovered); 810 detainees are in quarantine; and one detainee has died. *Public Safety Agency COVID-19 Case Data*, Gov't of D.C. (Apr. 28, 2020), https://coronavirus.dc.gov/page/public-safety-agency-covid-19-case-data. Further, as of April 28, 2020, 49 DOC staff members have tested positive, 36 are in quarantine, and one has died. *Id.* United States District Judge Colleen Kollar-Kotelly of the United States District Court for the District of Columbia recently found that, although the DOC was aware of the risks posed by COVID-19 on its residents, the DOC "disregarded those risks by failing to take comprehensive, timely, and proper steps to stem the spread of the virus," in violation of the detainees' due process rights. *Banks v. Booth,* No. 20-849 (CKK), 2020 WL 1914896, at *11 (D.D.C. Apr. 19, 2020).

The DOC has implemented substantial measures to protect detainees from being exposed to COVID-19. *See DC Department of Corrections' COVID-19 Response FAQs*, DC Dep't of Corr., https://doc.dc.gov/page/coronavirus-prevention (last visited May 1, 2020). Further, Judge Kollar-Kotelly has ordered the DOC to take additional actions at CTF to protect detainees, including triaging sick call requests, implementing social distancing policies, and ensuring that DOC staff are equipped with personal protection equipment. *See Banks*, 2020 WL 1914896, at *13-15. Notably, Judge Kollar-Kotelly did not order the release of any inmates detained in DOC facilities. *Id.* at *13.

The defendant has proposed a release plan that he claims would allow him to self-quarantine, thereby mitigating COVID-19 risks to himself and others. *See* Supplement (ECF No.

20

88 at 1-4).  He has arranged for transportation from the Baltimore courthouse to the proposed residence.  The defendant again proposes that he be placed in the custody of either his brother, Brandon Greene, or his aunt, Robin Parker.  As stated earlier, however, the Court does not find that it would be appropriate to order the defendant to reside with either of these proposed third-party custodians.  Additionally, as United States Magistrate Judge J. Mark Coulson recently commented on the third and fourth COVID-19 factors outlined above: "The remaining two factors depend in large part on how compliant Defendant would be with the directives of public officials and health experts should he be released.  Given his poor prior track record with compliance on supervised release conditions, the Court has significant pause."  *Green*, 2020 WL 1873967, at *3.

This Court shares Judge Coulson's concerns.  The defendant has performed poorly on community supervision in the past.  He has been found in violation of probation on four occasions.  There have been three unsatisfactory closings of parole supervision.  At the time of the present offenses, he was on probation as a result of two felony controlled-substance convictions.  The Court has significant concerns not only that the defendant would comply with release conditions, but also that he would comply with directives from public officials and public-health experts regarding COVID-19 precautionary measures.  For these reasons, the Court finds that the § 3142(g) factors outweigh the risk that the COVID-19 virus poses to the defendant, given his medical condition and the current COVID-19 situation at CTF.  Thus, the defendant has not established a compelling reason for release under § 3142(i).

## <u>**ORDER**</u>

Accordingly, it is this 1st day of May 2020, hereby **ORDERED** that the defendant's Emergency Motion to Reopen Detention Hearing and to Order Pretrial Release (ECF No. 81) is **DENIED**.

Date: May 1, 2020                                                                   /s/

                                                     Thomas M. DiGirolamo
                                                     United States Magistrate Judge