IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|                              |   |                          |
|------------------------------|---|--------------------------|
| UNITED STATES OF AMERICA     | : |                          |
|                              | : |                          |
| v.                           | : | Criminal No. DKC 20-0038 |
|                              | : |                          |
| JEROAM EDWIN NELSON, JR.,    | : |                          |
| ERIC TYRELL JOHNSON,         | : |                          |
| PHILANDER ALEXANDER SPRUILL, and | |                      |
| JARVIS ANTONIO COLEMAN-FULLER | : |                         |

**MEMORANDUM OPINION**

As noted in the prior Memorandum Opinion which largely resolved the motions to suppress wiretaps, many other motions challenging warrants to install tracking devices on vehicles, to obtain real time location data from cell towers, and to search residences, cars, and cell phones are pending. An additional hearing was held July 11, 2022.

## I.   GPS Tracking of Vehicles

Mr. Spruill (ECF No. 197, 2012 Acura, issued July 9, and ECF No. 198, 2013 Chrysler 300, issued July 2) and Mr. Nelson (ECF No. 236, 2018 Chevrolet Impala, issued August 28), moved to suppress the evidence obtained by virtue of warrants to install GPS tracking devices on vehicles linked to them.

Law enforcement sought and obtained warrants to attach GPS tracking devices to each automobile while in Washington County, Maryland, and to monitor its whereabouts for 30 days. The

installation of a GPS device and its use to monitor the vehicle's movements constitutes a "search" under the Fourth Amendment, *United States v. Jones*, 565 U.S. 400, 404 (2012), and a lawful warrant must be obtained to authorize that search.  The Court of Appeals of Maryland determined that an order issued pursuant to Md. Code Ann., Criminal Procedure § 1-203.1 satisfies that requirement.  *Whittington v. State*, 474 Md. 1, 23-31 (2021).  In sum, there must be probable cause to conclude that the defendant was using the vehicle to engage in narcotics trafficking.

Mr. Spruill contends in ECF No. 197, without much elaboration, that the warrant for the 2012 Acura lacks probable cause, fails to establish an adequate nexus between any probable cause and the place to be searched or the things sought to be seized, and that it was a "general warrant."  He says that investigators had only overheard a single conversation on July 6 between him and an unidentified person.  To the contrary, the application contained wiretap detail of conversations and texts made using his cell phone, TT6, and observations of him in the Acura in connection with drug activities.  The foundation was sufficient.

In ECF No. 198, Mr. Spruill contends that probable cause for the 2013 Chrysler 300 was lacking because it was based only on several conversations on June 21, 25, and 26 between himself and Edward Ware, and accompanying surveillance, that were not enough.

To the contrary, the conversations and related surveillance provided a basis to conclude that tracking the vehicle would yield evidence.

Mr. Nelson in ECF No. 236 labels the application "deficient" due to lack of detail or foundational facts. (ECF No. 236, at 5). He also argues that it is overbroad, lacks a sufficient nexus, and fails to supply probable cause that he was a drug supplier using the Impala to transport drugs. The only case cited is *United States v. Wilhelm*, 80 F.3d 116 (4th Cir. 1996). The section cited and the reference to a Fifth Circuit case contains discussion of the good faith exception to the exclusionary rule, and not to the determination of probable cause. *Wilhelm* involved an affidavit that depended on "information from an unnamed informant, and provided no indication of that informant's truthfulness or reliability." *Id.*, at 120. The court concluded that "[u]pholding this warrant would ratify police use of an unknown, unproven informant-with little or no corroboration-to justify searching someone's home." *Id.*

The Government, understandably, disagrees with Mr. Nelson and, while conceding that the affidavit "does not include a high level of detail," it contends that it provided sufficient basis for the judge's independent determination of probable cause. (ECF No. 313, at 55). It explains that the reluctance to divulge

details of the Pittsburgh encounter stemmed from the then covert nature of the investigation by the FBI.

There was enough information provided to justify the issuance of this tracking warrant.  The judge was informed of the extensive investigation already undertaken leading to issuance of wiretaps and a tracking warrant for Mr. Nelson's cell phone.  When information about the Pittsburgh encounter was obtained, law enforcement located the vehicle just outside that city at a time when location information for his cell phone indicated that Mr. Nelson was in the same area.  It frankly does not matter where the initial tip came from.  That only explains why law enforcement in Pittsburgh undertook surveillance.  Continued surveillance of the vehicle showed four occupants who met with "a known fentanyl distributor, who is a target of an active investigation" in that area.  Again, Mr. Nelson's phone was in the same area.  Thus, the affiant concluded that Mr. Nelson used this vehicle to commit narcotics distribution.  So could the judge.

## II.  Real Time Location Information

Cell-site location information ("CSLI") refers to the time-stamped record generated when a cell phone connects to the closest cell site.  The data is collected and stored by wireless carriers. *Carpenter v. United States*, 138 S.Ct. 2206, 2211-12 (2018).  In *Carpenter*, the Court held that a person maintains a legitimate

expectation of privacy in the record of his or her physical movements captured through CSLI, and when the Government obtains that information, it constitutes a search within the meaning of the Fourth Amendment. *Id.*, at 2217, 2220. Thus, generally a warrant is required to obtain those records. When "real time" information on the location of the phone is sought, it is sometimes called a "tracking warrant." *United States v. Taylor*, No. 15-cr-0265-TDC, 2020 WL 1904710, at *6 (D.Md. Apr. 17, 2020). In this case, and pursuant to Md. Code Ann., Crim. Proc. § 1-203.1 and Maryland Rule 4-612, applications were made to Maryland judges for orders to obtain real-time location information for the following cellular telephones: TT6 on July 2, TT8 on August 12, TT9 on August 14, and TT10 on August 20.

Mr. Spruill in ECF No. 105 argues that probable cause was lacking for the order to track TT6. The intercept on that phone had been authorized a few days earlier. As pointed out by the Government, the conversations were indicative of drug dealing and plans to meet. A conclusion that tracking the phone would provide evidence was more than justified.

Mr. Coleman-Fuller in ECF No. 231 argues that reliance on the warrant to track TT9 was not reasonable because false information was included, the magistrate abandoned his judicial role, the affidavit was lacking in detail, the warrant was facially

deficient, and the monitoring officers exceeded the scope of the warrant.  None of these arguments is fleshed out at all.  He merely attaches the warrant.

This warrant was sought on August 14, just after the controlled buy with confidential informant CS3 and Mr. Coleman-Fuller was seen arriving in a black Nissan Altima leased from Enterprise.  He had used TT9 to coordinate the meeting with CS3. The affidavit generally outlined the scope of the investigation and the role of Mr. Coleman-Fuller.  There was sufficient basis for the affiant, and the judge, to conclude that he was using TT9 in furtherance of drug trafficking and that the capture of real time location information would assist the investigation.

Mr. Nelson in ECF No. 237 argues for suppression of the CSLI for TT8 and TT10.  TT8, he says, was based on "just" four calls that don't support the affiant's conclusions about what was being discussed and, in any event, don't support issuance of the tracking authorization.  (ECF No. 237, at 3).  TT10 provided the same basis and added later interceptions involving Marvis Jackson and Mr. Coleman-Fuller.  Contrary to Mr. Nelson's arguments, there was more than sufficient detail from the conversations, coupled with the experienced interpretation supplied by the affiant, to justify the conclusion that CSLI would provide useful evidence.

## III. Search Warrants

### A.    Residences[1]

### 1.    746 Spruce Street, Apt. A Issued August 6, Executed August 12 (Spruill) (ECF No. 196)

Mr. Spruill contends without any elaboration that the affidavit lacks probable cause, does not show a nexus, and otherwise utterly fails the Fourth Amendment tests.  The Government catalogues on pages 24 and 25 of its memorandum, (ECF No. 313), the intercepted conversations and texts, GPS developed information, covert video surveillance, and physical surveillance that were detailed in the affidavit.  These lead to the logical conclusion that Mr. Spruill was dealing drugs, including when traveling from the residence as well as within it with Ms. Weedon's assistance.  Probable cause and nexus were shown, and no violation of the Fourth Amendment has been established.

### 2.    10090 Mill Run Circle, Apt. 201, Issued August 8, Executed August 12 (Eric Johnson) (ECF No. 213)

The court has already determined that the canine sniff was constitutional and may be considered in determining probable cause.  In reality, whether with or without the canine search, there was sufficient information on which the judge could conclude there was probable cause to search this apartment.  On July 9, Mr. Spruill was heard to tell a customer that he was going to Baltimore

---

[1] Car and cell phone searches will be discussed separately.

to obtain drugs.  GPS tracking on his phone then showed him going to the area near 10090 Mill Run Circle, and return.  Immediately thereafter, he appeared to conduct drug deals.  The next day, he again told a customer that he was leaving to obtain drugs.  Law enforcement then surveilled his car to 10090 Mill Run Circle where they "recorded [him] walking out of the building approximately half an hour after the GPS tracker showed that he had arrived." (ECF No. 313, at 34 (citing ECF No. 313-6, at 13-14)).

Then, on July 30, a covert camera at the rear of Mr. Spruill's residence in Hagerstown captured a 2016 Nissan Altima arrive and park.  The male occupant walked into the back door while the female waited outside.  Six minutes later, the male returned and the pair departed.  Law enforcement databases disclosed that the vehicle was registered to Latrice Campbell and had been stopped three times while being operated by Eric Johnson.  A comparison of his driver's license photo to the male captured on the covert camera behind Mr. Spruill's home show them to be the same person.  Investigators learned that Apartment 201 at 10090 Mill Run Circle was leased to Ms. Campbell.  Mr. Spruill also travelled to that area several more times between July 15 and August 6.  The canine sniff on August 7 was positive for the odor of controlled substances.  This information, again with or without the canine sniff, provided a sufficient basis for probable cause to search the apartment.

8

**3. 45 Elgin Boulevard, Issued September 7, Executed September 9 (Nelson's Girlfriend) (ECF No. 236)**

Mr. Nelson primarily contests the conclusion that this residence, registered to Geneses Walsh, was used by him for the distribution of drugs and that evidence of his involvement would be found there.  First, it is relevant that Title III intercepts had been authorized, including on his phone.  Second, GPS and covert cameras identified this address as a location "associated" with him and that he "frequents" it.  (ECF No. 313-11, at 4).  Then, on September 1 and 2, a series of texts and voice calls culminated with Mr. Nelson saying he would be at his "old bitch house" after which GPS tracked his vehicle to the rear of the residence and surveillance cameras showed him enter.  (ECF No. 313, at 57 (*Id.* at 8-9)).  His Chevrolet Impala was observed to arrive and park, a white Honda arrived and a female exited and went into the residence.  Mr. Nelson also entered the residence.  The female then came back out, retrieved a black bag from the Honda, went back in and out right away, and then left in the Honda.  A few minutes later, Mr. Nelson left the residence, went to the Chevrolet Impala, and went back into the residence.  Then, Mr. Coleman-Fuller arrived and was heard asking where Mr. Nelson was.  Mr. Nelson said he was in the house and Mr. Coleman-Fuller told him to open the door.  Mr. Coleman-Fuller went inside and left a few minutes later.  Agent Teets inferred that Mr. Coleman-Fuller

obtained drugs from Mr. Nelson while inside the residence.  Checks on various records established whose name the residence was in, and that Mr. Nelson's phone was in contact with a number subscribed to by that same person.  The warrant was issued five days after the Coleman-Fuller encounter.  A sufficient connection between Mr. Nelson and this residence was shown.

Mr. Nelson also contends that the warrant fails to establish probable cause that the clothing and persons of everyone found there should be searched, or to open and search any safes, boxes, bags, etc., as well as cell phones.  The return indicates that ammunition, a plastic baggie containing controlled drug substances ("CDS"), and property of Mr. Nelson and another were seized.  The language in the warrant does not invalidate it.  No cell phones were seized at this location.  Mr. Nelson's arguments regarding the search of cell phones seized elsewhere are discussed below.

### 4.   105 Hillcrest Road, Issued September 7, Executed September 9 (Nelson's Mother) (ECF No. 236)

Mr. Nelson was in this residence when the search warrant was executed early in the morning on September 9.  He challenges the nexus and scope of this warrant, and points out inconsistencies between this affidavit and others, and obvious errors from copying from other affidavits.

In addition to the background of the investigation, this affidavit recounted a conversation on August 29 between Mr. Nelson

and an unknown man who was seeking to get drugs.  According to the interpretation of investigators, Mr. Nelson said he would have to travel to get the drugs.  GPS tracking on his Chevy Impala showed he drove to this house, where, via covert camera, he was seen to arrive, park, and go inside.  After another intercepted call, in which he said he was coming, Mr. Nelson left the Hillcrest residence, and another call was intercepted indicating a drug deal would occur.   On September 6, investigators knew based on intercepted conversations and GPS tracking that Mr. Nelson was coming back to Hagerstown.  Communications with Mr. Coleman-Fuller indicated that the two were trying to meet for exchange of CDS. As interpreted by investigators, Mr. Nelson told Mr. Coleman-Fuller he would "probably be at [his] house" and to meet him there. (ECF No. 313-12, at 12).  After a stop at McDonald's, Mr. Nelson drove to the Hillcrest residence.  Mr. Coleman-Fuller called again and Mr. Nelson said he was "at my momma's house."  (*Id.*).  Mr. Nelson arrived there, carrying a McDonald's bag and cup and a white shopping bag.  Mr. Coleman-Fuller arrived and left about half an hour later.  The wire intercepts and GPS tracking showed that Mr. Nelson traveled to this residence numerous times.

Again, the connection of Mr. Nelson with this residence and with his drug dealing was shown sufficiently in this application. The investigators had reliable information that he was at this

11

location "numerous" times, he referred to it as "his" or "his momma's" house, and he twice was there for drug deals, either picking up drugs or making an exchange shortly before the issuance of this warrant.

### 5.   30 East Franklin Street, Apt. 3, Issued September 6, Executed September 9 (Coleman-Fuller) (ECF No. 229)

Mr. Coleman-Fuller in ECF No. 229 contends that this affidavit failed to demonstrate probable cause or adequate nexus.  He argues that, aside from possibly establishing that he lives there, the affidavit provides "nothing but hunches and boilerplate language." The single controlled buy occurred elsewhere, a month prior to the search, and only places him there a month before.  He says there is no corroboration of the "self-serving" interpretations of law enforcement.

As with the others, this affidavit begins with some of the history of the investigation, including that a Title III intercept on Mr. Coleman-Fuller's phone was authorized.  The rear area of 28 and 30 East Franklin Street are described.  Investigators had learned that Mr. Coleman-Fuller parked his car in the rear.  They intercepted communications leading them to believe that he traveled to and from this residence to pick up CDS for distribution.  On September 4, a female contacted him and he agreed to provide something, and he told her he was on the way to his residence.  He was observed in the 2019 Nissan Altima arriving a

12

few minutes later, and he walked to the common rear entry door.

Another communication only a few minutes later occurred with

another female who also placed an order.  Mr. Coleman-Fuller again

agreed.  His cell phone was at this residence, according to the

tracking of the phone.  After telling one of the females that he

was leaving his house, he was seen to exit and get into the 2019

Nissan and leave the area.  Utilities at the residence are in his

name, he was there when police came to investigate a complaint

from an ex-girlfriend, and he has been seen there via physical and

electronic surveillance multiple times a day.  This was enough.

**B.    Cars**

Warrants to search several cars found at the time of the

residence searches were obtained and are now challenged.

Defendants argue that the warrants lacked probable cause and nexus.

**1.    Probable Cause**

**a)    2018 Chevrolet Impala, Issued and Executed September 9 (Nelson) (ECF No. 236)**

This affidavit begins with some background information and

then recounts that investigators had "learned" that Mr. Nelson

rents and operates numerous vehicles that he uses to transport CDS

and money.  (ECF No. 313-13, at 4).  Enterprise reported that he

typically returns a rental car after having it for a "short" period

and rents a new one.  He rented this car on August 26.  They

believe the Hillcrest residence was his "stash" house and he was

13

observed there "on almost a daily basis." (*Id.*).  He was seen on August 27, (*see* ECF No. 313, at 64 n.13 (admitting typo in application and explaining correct date)), "accessing the tru[n]k of the vehicle and carrying items into the residence," (ECF No. 313-13, at 4).  The search warrant was executed on September 9, and this vehicle was parked in front.  Mr. Nelson was inside the residence as were the keys.  Also inside were approximately 1 kilogram of heroin or fentanyl, cocaine, digital scales, a drug press, and a heat sealer.  This was sufficient.

> **b)   2019 Nissan Altima, Issued and Executed September 9 (Coleman-Fuller) (ECF No. 230)**[2]

In addition to the information included in the affidavit to search Mr. Coleman-Fuller's residence (including that he drove this vehicle when going to and from the residence to conduct drug deals), this affidavit stated that the search warrant was executed on September 9, he was inside, and had a key to this vehicle.  It was found parked outside and towed to the impound lot.  The affidavit recounted that fentanyl, heroin, paraphernalia, currency and scales were found in the residence.  Again, there was probable cause.

---

[2] While the car is identified as rented and operated by Mr. Coleman-Fuller, an extraneous paragraph appears at the bottom of page 8 and the top of page 9 apparently taken from the warrant for the Chevrolet Impala rented by Mr. Nelson.  (ECF No. 313-6).

**c)   2011 Ford Crown Vic, Issued and Executed September 10 (Coleman-Fuller) (ECF No. 230)**

Again, in addition to some of the background and material included in the affidavit to search the residence (including placing Mr. Coleman-Fuller near or in the Crown Vic), this affidavit reported that fentanyl and heroin were found during the search of the residence, and that Mr. Coleman-Fuller had a key to this vehicle.  It was found parked in the rear and towed to the impound lot.  The next day, a canine team conducted a scan, resulting in a positive alert.  Probable cause, particularly in light of the canine alert, was shown.

**d)   2012 Acura TL and 2013 Chrysler 300 (Spruill) (ECF Nos. 199; 216)**

These motions are moot because the Government will not seek to introduce any evidence from these vehicles.

**2.   Nexus**

None of the affidavits specifically state why the evidence is expected to be found in the cars.  Despite lengthy lists of what the affiant "knows" based on training, experience, and participation in other investigations, there is no statement as to what drug traffickers normally keep or leave in their cars. Instead, the Government cites to *United States v. Servance*, 394 F.3d 222 (4th Cir. 2005), *vacated on other grounds*, 125 S.Ct. 2308 (2005), for the proposition that evidence found in each residence "was enough to establish probable cause to search [the] vehicle

parked outside based on 'the normal inferences of where one would likely keep' drugs or proceeds. *See Servance,* 394 F.3d at 230." (ECF No. 313, at 65). Elsewhere, the Government cites *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005), for the principle that "warrants are to be upheld 'even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought' to the place to be searched." (ECF No. 313, at 19). The court in *Grossman* distinguished *United States v. Lalor*, 996 F.2d 1578 (4th Cir. 1993), where there was no basis "from which the magistrate could infer that evidence of drug activity would be found at" the location. 400 F.3d at 218 n.1.

Those authorities do indicate that it might be reasonable to conclude that a drug dealer stores drugs or tools of the trade in a **residence** he controls. It might be less obvious that things are kept in a vehicle, particularly a rental vehicle that is kept only a brief time. But then, the good faith exception to the exclusionary rule from *United States v. Leon*, 468 U.S. 897, 913 (1984), would apply. *See Servance*, 394 F.3d at 231 n. 5 (acknowledging good faith exception); *see also United States v. Martin*, 839 F. App'x 789, 792 (4th Cir. 2021) ("[A]n inference can be reasonably made that a car parked in the driveway of the target residence may be a place where drugs are located. We discern no basis to conclude that 'a reasonably well trained officer would

16

have known that the search [of the vehicle] was illegal despite the magistrate's authorization.' *United States v. Williams*, 548 F.3d 311, 317 (4th Cir. 2008) (internal quotation marks omitted).").  Each of these vehicles was shown to have been used in the drug distribution activities of the respective defendant and each defendant had the key to the vehicle in his possession or nearby when the searches of the residences occurred.  Thus, even if the nexus was imprecisely described in the warrant application, the good faith exception would apply.

C.   **Cell Phones (ECF Nos. 245, 265, 213, 341)**

Each of the warrants to search a residence authorized the agents to "open and search any . . . cellular telephones" or "electronic devices" and "to seize and search all . . . electronic devices such as cellular telephones and the data stored in them." (*E.g.*, ECF Nos. 313-12, at 20; 313-15, at 11).  Defendants contend that this blanket authorization to seize and search any and all cell phones found rendered the warrants impermissibly broad and converted them to general warrants.

The warrants for 746 Elgin and 30 East Franklin were issued based on an affidavit incorporated into the warrant stating that there was probable cause to believe that CDS and other items related to the distribution of CDS would be found.  (ECF No. 313-4, at 29).  The warrants for two of the others, 45 Elgin Boulevard

and 105 East Hillcrest Road, did not expressly incorporate the affidavit, but were based on the written information of the affiant.  The warrant directed the searching officer to leave a copy of the warrant, affidavit and application, and inventory, implying that the searching officers would have the entire package with them.  The actual warrant for 10090 Mill Run Circle does not appear to be in the materials submitted to the court.

Generally, of course, cell phones have become ubiquitous. They are, in the words of Chief Justice Roberts, "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley v. California*, 573 U.S. 373, 385 (2014).  The investigation in this case showed that cell phones were used widely by those thought to be involved, which was no surprise.  The actual use of some of the phones, through intercepted conversations and texts, as well as location information, was detailed in each warrant.  In the list of things "known" based on training, experience, and participation in other investigations, were the following:

> H. That narcotics traffickers often utilize electronic equipment such as . . . cellular telephones to generate, transfer, count, record and/or store the information described in items A [assets], C [currency], D [books, records of funds and transportation, ordering, sale, and distribution of controlled

substances], E [contraband] and G [proceeds] above.

. . .

R. That cocaine and/or other controlled dangerous substance traffickers commonly maintain addresses or telephone numbers in . . . cellular telephones which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization[.]

S. That narcotics traffickers utilize cellular telephones, personal digital assistants (PDA), text messaging, and "push to talk" or "direct connect" so as to make it more difficult for law enforcement authorities to identify and/or intercept their conversations.

. . .

U. That drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their product using still and video cameras. That these traffickers usually maintain these photographs in their possession.

(*E.g.*, ECF No. 313-15, at 8-9).

Defendants point to cases, primarily from jurisdictions other than the Fourth Circuit, to argue that these warrants lacked both probable cause to seize all cell phones found in the location or that phones would be found there. They also argue that law enforcement should have sought a separate warrant to conduct a forensic extraction.

They rely heavily on *United States v. Griffith*, in which Judge Srinivasan set up the problem as follows:

19

Most of us nowadays carry a cell phone. And our phones frequently contain information chronicling our daily lives—where we go, whom we see, what we say to our friends, and the like.  When a person is suspected of a crime, his phone thus can serve as a fruitful source of evidence, especially if he committed the offense in concert with others with whom he might communicate about it.  Does this mean that, whenever officers have reason to suspect a person of involvement in a crime, they have probable cause to search his home for cell phones because he might own one and it might contain relevant evidence?  That, in essence, is the central issue raised by this case.

867 F.3d 1265, 1268 (D.C. Cir. 2017).  The court went on to suppress the search and seizure of a cell phone found during the search of a residence.  *Id.*  Notably, the court found that the affidavit could not even support a belief that the defendant, who was suspected of being the getaway driver for a past homicide, owned a cell phone, let alone that any cell phone found in the residence was connected to his alleged crime.  *Id.*, at 1268, 1272-75.

The single Fourth Circuit case cited is *United States v. Lyles*, which affirmed a trial court ruling suppressing evidence in a felon in possession case.  As described by the Fourth Circuit, "[t]he firearms were found in [the defendant's] home, which police searched after obtaining a warrant based on finding three marijuana stems in a trash pull."  910 F.3d 787, 790 (4th Cir. 2018).  The police were investigating a homicide and saw the defendant's number in the victim's cell phone.  They had a hunch that the defendant

might be relevant to that investigation, so they searched trash bags near the defendant's home and applied for a warrant based on what they found.  After two hearings, the trial judge suppressed the evidence finding that "the presence of only three marijuana stems and rolling paper . . . does not establish a fair probability that additional marijuana will be found within the home."  *United States v. Lyles*, No. 17-cr-0039-TDC, 2017 WL 5633093, at *4 (D.Md. Nov. 20, 2017).  "The court did not apply the good faith exception because the warrant was not supported by probable cause and was plainly overbroad."  *Lyles*, 910 F.3d at 791.

More pertinent here, the Fourth Circuit also remarked:

> The warrant also allowed the search and seizure of any cell phones in the home.  J.A. 28 at para. 7.  The Supreme Court has recognized that "cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." *Riley v. California*, --- U.S. ----, 134 S.Ct. 2473, 2488-89, 189 L.Ed.2d 430 (2014).  But cell phones also carry more information that can be essential to an investigation than do cigarette packs, wallets, or purses.  We need not explore that tension here, as the warrant application lacked any nexus between cell phones and marijuana possession.  There is insufficient reason to believe that any cell phone in the home, no matter who owns it, will reveal evidence pertinent to marijuana possession simply because three marijuana stems were found in a nearby trash bag.  At some point an inference becomes, in Fourth Amendment terms, an improbable leap.

*Lyles*, 910 F.3d at 795.

To this list, the court also found a recent case from the District of Columbia Court of Appeals, applying a very strict standard to the search of a cell phone.  In *Burns v. United States*, 235 A.3d 758, 773-74 (D.C. 2020), the court held:

> A search warrant for data on a modern smart phone therefore must fully comply with the requirements of the Warrant Clause. It is not enough for police to show there is probable cause to arrest the owner or user of the cell phone, or even to establish probable cause to believe the phone contains some evidence of a crime.  To be compliant with the Fourth Amendment, the warrant must specify the particular items of evidence to be searched for and seized from the phone and be strictly limited to the time period and information or other data for which probable cause has been properly established through the facts and circumstances set forth under oath in the warrant's supporting affidavit. Vigilance in enforcing the probable cause and particularity requirements is thus essential to the protection of the vital privacy interests inherent in virtually every modern cell phone and to the achievement of the "meaningful constraints" contemplated in *Riley*, 573 U.S. at 399, 134 S.Ct. 2473.  As the Supreme Court recently reiterated, judges are "obligated — as 'subtler and more far-reaching means of invading privacy have become available to the Government' — to ensure that the 'progress of science' does not erode Fourth Amendment protections." *Carpenter v. United States*, -- - U.S. ----, 138 S.Ct. 2206, 2223, 201 L.Ed.2d 507 (2018) (quoting *Olmstead v. United States*, 277 U.S. 438, 473-74, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting) (requiring that search warrants be obtained for cell-site location data generated from the use of smart phones and held by third-party providers)).

We conclude as a matter of law that the search warrants for Mr. Burns's cell phones did not satisfy the requirements of the Warrant Clause.  The facts set forth in the warrants' supporting affidavits established probable cause to believe the phones contained text messages between Mr. Burns and Mr. Osuchukwu on November 14, 2015 and a log showing the precise time of the telephone call Mr. Burns reportedly made to his cousin (W-3) that night.  The facts alleged in the affidavits also supplied probable cause to support a search of the GPS tracking features on the phones to determine Mr. Burns's whereabouts at pertinent times on November 14 and 15, 2015. But beyond those discrete items, the affidavits stated no facts that even arguably provided a reason to believe that any other information or data on the phones had any nexus to the investigation of Mr. Osuchukwu's death.

In lieu of facts, Detective Littlejohn simply stated it was his "belief" there was probable cause that evidence related to the homicide would be found on the phones — specifically, in the phones' subscriber and owner information, call logs, contact lists, voice mail and text messages, videos, photographs, and tweets.  The detective added it was his "belief" this information could establish the whereabouts of Mr. Burns's and W-3's phones at the time of the murder and "help identify potential witnesses, suspects and confederates yet unknown."

The Government, in contrast, asserts that relevant authorities support upholding the warrants in this case.  Cell phones are recognized as tools of the drug trade.  In this case, that certainly was true.  All except Mr. Johnson were overheard on the intercepts, and there was good reason to conclude that he was

contacted by Mr. Spruill over a telephone.  It cites *Andresen v. Maryland*, 427 U.S. 463 (1976) and *United States v. Williams*, 592 F.3d 511 (4th Cir. 2010).  *Andresen* dealt, in part, with the question of the proper interpretation of the warrant and the notion of a "general warrant":

> General warrants of course, are prohibited by the Fourth Amendment.  "(T)he problem (posed by the general warrant) is not that of intrusion Per se, but of a general, exploratory rummaging in a person's belongings. . . . (The Fourth Amendment addresses the problem) by requiring a 'particular description' of the things to be seized." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971).  This requirement "'makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'" *Stanford v. Texas*, 379 U.S. 476, 485, 85 S.Ct. 506, 512, 13 L.Ed.2d 431 (1965), quoting *Marron v. United States*, 275 U.S., at 196, 48 S.Ct. at 76.
>
> In this case we agree with the determination of the Court of Special Appeals of Maryland that the challenged phrase must be read as authorizing only the search for and seizure of evidence relating to "the crime of false pretenses with respect to Lot 13T." 24 Md.App., at 167, 331 A.2d, at 103.  The challenged phrase is not a separate sentence. Instead, it appears in each warrant at the end of a sentence containing a lengthy list of specified and particular items to be seized, all pertaining to Lot 13T.  We think it clear from the context that the term "crime" in the warrants refers only to the crime of false pretenses with respect to the sale of Lot 13T.

> The "other fruits" clause is one of a series
> that follows the colon after the word
> "Maryland."   All clauses in the series are
> limited by what precedes that colon, namely,
> "items pertaining to . . . lot 13, block T."
> The warrants, accordingly, did not authorize
> the executing officers to conduct a search for
> evidence of other crimes but only to search
> for and seize evidence relevant to the crime
> of false pretenses and Lot 13T.

427 U.S. at 480-82.

Earlier this year, Judge Faber catalogued a variety of Fourth
Amendment principles in the course of finding that the good faith
exception applied to the search of a cell phone.  His explanation
concerning the breadth of the search, which cites *United States v.
Williams*, follows.

> Warrants must not authorize a search or
> seizure greater in scope than existing
> probable cause can sustain; otherwise, they
> are overbroad.  *See Manafort*, 323 F. Supp. 3d
> at 801 (noting that scope must "be limited by
> the probable cause on which the warrant is
> based.");   *United States v. Skinner*,  No.
> 3:19CR19, 2021 WL 1725543, at *9 (E.D. Va.
> Apr. 29, 2021) (noting that "the breadth
> requirement commands that probable cause exist
> for the items that are listed [in the
> warrant].").
>
> As to the scope of an electronic search, if
> there is probable cause to search a computer
> for evidence of a crime, that probable cause
> is usually sufficient to sustain a search of
> the entire computer.  *See [United States v.]
> Cobb*, 970 F.3d [319, 329 (4th Cir. 2020)];
> *United States v. Williams*, 592 F.3d 511, 520
> (4th Cir. 2010).  A search of a cell phone is
> analogous to a search of a computer.  *See Riley
> v. California*, 573 U.S. 373, 393 (2014);

*United States v. Bishop*, 910 F.3d 335, 337 (7th Cir. 2018).   And a search of a computer is analogous to a search of a large file cabinet. *Williams*, 592 F.3d at 523 ("[W]e conclude that the sheer amount of information contained on a computer does not distinguish the authorized search of the computer from an analogous search of a file cabinet containing a large number of documents."); *Bishop*, 910 F.3d at 337 ("[A]s with filing cabinets, the incriminating evidence may be in any file or folder [of a cell phone].").   Thus, for purposes of the Fourth Amendment, a cell phone can be conceptualized as an enormous filing cabinet.

As one district court in this circuit recently noted, our Court of Appeals has twice rejected the "paradigm" that would require, in the context of searches of electronic devices, warrants to describe the "manner" of the search or "constrain it to items already known to law enforcement." *Skinner*, 2021 WL 1725543, at *15 (citing *Cobb*, 970 F.3d at 328; *Williams*, 592 F.3d at 521-22).   While "the Fourth Amendment might require more specificity as to the place to be searched or the items to be seized in some computer searches," officers are generally not required to predict the items of evidence that an electronic search will uncover or predict where on the computer the evidence will be found.   *Cobb*, 970 F.3d at 329 (emphasis added).

Rather, officers should search electronic devices in a manner that respects the limits of what is to be seized: They should not go looking where the evidence to be seized is unlikely to be, and innocuous files should be viewed only "cursorily."   *Williams*, 592 F.3d at 519; *see also Cobb*, 970 F.3d at 328 (holding that specificity in object of search (evidence of a murder) sufficiently "confined the executing officers' discretion").

26

> Insisting that warrants carve out portions of computers and cell phones to be searched (thereby making other portions of the devices completely off-limits to law enforcement) has surface appeal but is neither constitutionally required nor practical in most circumstances. *See Cobb*, 970 F.3d at 329 ("Accordingly, more specificity was not required under the Fourth Amendment, nor was limiting the scope of the computer search practical or prudent under the circumstances of this investigation."). "As courts have had to recognize, the nature of electronic evidence requires that filtering occur at the review level. This means that a cursory review of innocuous material may sometimes happen in order to establish what information is relevant." *Skinner*, 2021 WL 1725543, at *18.
>
> In determining a warrant's permissible level of breadth, a balance must be struck between "protecting privacy" and "permitting legitimate investigation." *See Bishop*, 910 F.3d at 338. There is constitutional breathing room between a warrant that, in retrospect, could have been narrower, and an unconstitutionally overbroad warrant. *See Cobb*, 970 F.3d at 328.

*United States v. Almonte*, No. 21-cr-0160, 2022 WL 662318, at *10–11 (S.D.W.Va. Mar. 4, 2022).

At first blush, these warrants appear problematic both because they authorize the seizure of all cell phones and because they authorize the search of the phones and all data stored in them. On closer inspection, however, and in light of the relevant authorities, these warrants pass constitutional muster, albeit barely. Some of the defendants had been shown to use more than one phone during the course of the alleged conspiracy. The

premises being searched were not likely to be occupied by many adults unconnected to the alleged drug distribution conspiracy. For instance, at the Spruill residence only he and Ms. Weedon lived there (with children) and both had been implicated in drug trafficking and use of cell phones.   Three phones were seized there, including TT6 and another showing texts between Mr. Spruill and Mr. Johnson.  As to the Nelson searches, again the universe of expected occupants was limited.   No phones were seized at Elgin Boulevard, where his ex-girlfriend lived.   At Hillcrest, four phones were seized, two near Mr. Nelson and two in the master bedroom.  The Government will only use evidence from Mr. Nelson's phone, TT10, which was on the floor of the living room where he was located.  There has been no showing of any involvement by his mother, whose house it was.  Mr. Nelson's presence there, though, was sufficiently pervasive to permit seizure of any phone.  At the Johnson apartment, three cell phones were seized.  Only two adults lived there, Mr. Johnson and his girlfriend, who had accompanied him on the trip to Hagerstown.

Furthermore, the warrants were limited to searches for evidence of CDS crimes.   Indeed, in addition to the general limitation to evidence of CDS violations in "CR 5-303(d) — 5-904," or "the illegal possession, manufacturing, distribution, and possession with intent to distribute controlled dangerous

substances," the provision authorizing searches of people and clothing explicitly stated that it applied to those "who may be participating in violations of statutes hereinbefore cited, and who may be concealing evidence, paraphernalia, documents, money, firearms, and Controlled Dangerous Substances." (*E.g.*, ECF Nos. 313-12, at 19; 313-15, at 11).

The scope of the permitted search was also within constitutional limits. Fed.R.Crim.P. 41(e)(2)(B) recognizes that seizure and copying of electronically stored information may not take place during the initial search, but may occur later and that review of that electronically stored information may be later still. The warrant need not, and often cannot, set forth the precise manner of execution, as discussed by the Fourth Circuit in *United States v. Cobb*:

> Like the district court, we also reject Cobb's claim that, in addition to specifying the crime under investigation, the warrant should have also described the "types of files sought, the location of the files, the timeframe [and] the relationship between the files and information" that the police had about Wilson's murder. Brief of Appellant at 11. Cobb does not explain, in any meaningful way, exactly how the warrant could have specified the files that contained the evidence of murder. But even if it were true that the warrant could have been more specific, the Fourth Amendment simply did not demand that the warrant be more specific in this case.

> The Supreme Court has "previously rejected efforts to expand the scope of [the particularity] provision to embrace unenumerated matters." *Grubbs*, 547 U.S. at 97, 126 S.Ct. 1494; *see id.* at 97-99, 126 S.Ct. 1494 (rejecting challenge to the particularity of an anticipatory warrant because the warrant did not include the conditions precedent to execution of the warrant); *see also Dalia v. United States*, 441 U.S. 238, 257, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979) ("Nothing in the language of the Constitution or in this Court's decisions interpreting that language suggests that . . . search warrants also must include a specification of the precise manner in which they are to be executed."). And, to the extent any question remained, this circuit recently made clear that "a warrant may satisfy the particularity requirement either by identifying the items to be seized by reference to a suspected criminal offense or by describing them in a manner that allows an executing officer to know precisely what he has been authorized to search for and seize." *Blakeney*, 949 F.3d at 863. The warrant need not satisfy both criteria. *See id.*

970 F.3d 319, 328-29 (4th Cir. 2020), as amended Aug. 17, 2020, *cert. denied*, 141 S.Ct. 1750 (2021).

These principles apply equally to the search of a computer:

> To the extent Cobb's challenge speaks more to the requisite specificity as to the "place" to be searched when the "place" is a computer, it also fails. In *United States v. Williams*, we addressed a similar challenge to a warrant that authorized the search of a defendant's computer for evidence of specific crimes, during which the officers inadvertently discovered images of child pornography. In addressing the application of the plain view exception to the warrant requirement, we held that, so long as the Fourth Amendment's basic requirements of probable cause and

particularity are met, the executing officers
are "impliedly authorized ... to open each
file on the computer and view its contents, at
least cursorily, to determine whether the file
[falls] within the scope of the warrant's
authorization—i.e., whether it relate[s] to
the designated ... crimes." *Williams*, 592
F.3d at 521-22.

Here, the warrant authorized a search of the
specific computer that Cobb had asked his
parents to retrieve from his bedroom, keep
safe in their room, and "clean" because Cobb's
victim had recently used it.  It is true that
the officers suspected the computer might
contain evidence explaining why Cobb killed
Wilson, and whether he planned to murder him,
by suffocation or by other means.  And it is
arguable that the evidence of child
pornography was the evidence of motive that
Cobb sought to wipe from the computer.  But,
as the district court correctly observed, the
officers had no way of knowing when they
applied for the warrant exactly what the
evidence was that Cobb sought to destroy, or
where Cobb had placed the evidence on the
computer.  The officers had probable cause to
believe that Cobb's computer contained
evidence pertinent to Cobb's murder of Wilson
on September 7, 2014, and that Cobb's parents
were willing to lie, destroy evidence, and
manufacture evidence to support the narrative
that Cobb's murder of Wilson was defensive in
nature.  Accordingly, more specificity was not
required under the Fourth Amendment, nor was
limiting the scope of the computer search
practical or prudent under the circumstances
of this investigation.

*Cobb*, 970 F.3d at 329.

Defendants challenge the facial validity of the warrants,

arguing that they permitted general searches of the phones.  Other

than stating that the Cellebrite forensic download produced

thousands of pages, they have not presented evidence of the manner in which the searches were conducted nor of the seizure of data that does not fall within the contours of the warrant.  At least two of the cell phones that were searched had been the subject of wiretaps.  Another is described as containing the texts between two alleged co-conspirators.  Location data of the cell phones had been helpful in the investigation.  Identities of associates and their contact information were also expected to be contained in "books, papers or cellular telephones" in each location.  More particularity was impractical, and was not required.

Finally, even of these warrants were defective in some fashion, the good faith exception would apply.  *See United States v. Thomas*, 908 F.3d 68, 72-75 (4th Cir. 2018).

## IV.  Disclosure of Rule 404(b) and 609 Evidence (ECF No. 225)

At the hearing, counsel for Mr. Coleman-Fuller advised that, as of now, the government has provided what is required, and has indicated that it will provide more information at appropriate times in the future.  This motion will be denied as moot.

## V.  Identity of CS3 (ECF No. 228) (Coleman-Fuller)

Mr. Coleman-Fuller has not shown that he is entitled to the identity of CS3, whose only role was delineated in applications for wiretaps or warrants.  He is not charged with any crime involving CS3.  Under the circumstances, the Government will not

32

be directed to reveal the identity.   As stated by the Fourth
Circuit in *United States v. Gray*, 47 F.3d 1359, 1364-65 (4th Cir.
1995):

> [T]his Court has consistently held that the
> government is not privileged to withhold the
> name of a confidential informant when the
> informant's identity is relevant and helpful
> to the defense or is essential to fundamental
> requirements of fairness.  *E.g., United States
> v. Price*, 783 F.2d 1132, 1137 (4th Cir. 1986)
> (quoting *Roviaro v. United States*, 353 U.S.
> 53, 60-61, 77 S.Ct. 623, 627-28, 1 L.Ed.2d 639
> (1957)).   This benefit to the defendant of
> knowing the informant's identity is one factor
> a court must consider in deciding whether to
> order disclosure under the balancing test
> established by the Supreme Court in *Roviaro v.
> United States*, 353 U.S. 53, 60-62, 77 S.Ct.
> 623, 627-29, 1 L.Ed.2d 639 (1957).    In
> *Roviaro*, the Court rejected a per se approach
> to the disclosure of an informant's identity
> and instead adopted a test that balances "the
> public interest in protecting the flow of
> information against the individual's right to
> prepare his defense."  *Id.*, at 62, 77 S.Ct.
> at 629.
>
> In conducting this *Roviaro* balancing, this
> Court has emphasized that the key to reviewing
> a district court's failure to compel
> disclosure is a balancing of the competing
> interests "in light of the particular
> circumstances of the case." *Mabry*, 953 F.2d
> at 131 (quoting *United States v. Brinkman*, 739
> F.2d 977, 981 (4th Cir. 1984)).  We have also
> determined that an important factor affecting
> disclosure is the informant's involvement in
> the criminal acts of the accused.  In
> delineating the significance of this
> involvement, we have held that the government
> is privileged to withhold the identity of the
> informant when the informant was a "mere
> tipster," *e.g., McLawhorn v. North Carolina*,

484 F.2d 1, 5 (4th Cir. 1973), or was used only for obtaining a search warrant, *e.g., United States v. Poms*, 484 F.2d 919, 922 (4th Cir. 1973), but that failing to disclose the informant's identity more likely amounts to error when the informant was an active participant in the events leading to the arrest of the accused, *e.g., Blevins*, 960 F.2d at 1258.

**VI.   Conclusion**

For the foregoing reasons, the motions will be denied.   A separate order will be entered.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
